MALINDA MANGAM, as Administratrix, etc., Appellant, v. THE CITY OF BROOKLYN, Respondent.

The provision of the State Constitution (Art. 3, § 18), prohibiting the legislature from passing a private or local bill "creating, increasing or decreasing fees, percentage or allowances of public officers, during the term for which said officers are elected or appointed," does not apply to officers receiving fixed salaries ; it includes only those irregular and uncertain modes of compensating public servants indicated by words of like meaning with fees, percentage, etc.

The provision of the act of 1877 (§ 6, chap. 459, Laws of 1877), in relation to the salaries, etc., of officers of the city of Brooklyn, which declares that the act "shall not apply to any officers who, under the provisions of the Constitution, cannot have their fees, percentage or allowances increased during their present terms of office," and the similar provision of the act of 1879 (§ 7, chap. 467, Laws of 1879), amending said act of 1877, have reference to the constitutional provision above referred to. It was not the intent of the legislature, however, to limit the operation of said acts to subsequently elected or appointed officers, but simply to save them from possible condemnation as being in conflict with the Constitution.

Where, therefore, under the act of 1877, the common council of the city reduced the salaries of patrolmen from $1,100 to $1,000, the same deduction being also made by the act of 1879, — Held, that the salary of a policeman then in office was thereby lawfully reduced.

(Argued March 11, 1885 ; decided April 14, 1885.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, entered upon an order made September 9, 1884, which affirmed a judgment in favor of defendant, entered upon a verdict directed by the court.

The nature of the action and the material facts are stated in the opinion.

*Erastus Cooke* for appellant. Plaintiff being an incumbent of the office at the time of the passage of the act of 1877, his compensation was not affected by that statute.. (*Sill* v. *Village of Corning*, 15 N. Y. 306 ; *Curtis* v. *Leavitt*, id. 259 ; *Morey* v. *Farmers' L. and T. Co.*, 14 id. 306 ; *Moultrie* v. *Hunt*,

23 id. 419; *Conkling* v. *Egerton*, 21 Wend. 430.) Such effect must be given to the statutes as the legislature intended, when the intent is apparent from the language employed, without regard to the literal sense, or any imperfections or inaccuracies. of expression. (*Smith* v. *People*, 47 N. Y. 336.) The act of 1877 is a local bill. Although a public statute, it is local, because it affects " but a portion of the territory of the State." (*People* v. *Supervisors*, 43 N. Y. 10; *Kerrigan* v. *Force*, 68 id. 383; *Fellows* v. *Mayor*, etc., 8 Hun, 484.) The point made that the act may be regarded as amending the city charter, and, therefore, not within the constitutional restrictions, is untenable. (*People* v. *O'Brien*, 38 N. Y. 193; *People, ex rel. Gass*, v. *Lee*, 28 Hun, 469.) Patrolmen are public officers. (*People* v. *Draper*, 15 N. Y. 539; *People* v. *B'd of Police*, 19 id. 188; *People* v. *Nostrand*, 46 id. 381; *People* v. *Common Council*, 77 id. 507; *Rowland* v. *Mayor*, etc., 83 id. 376; *People* v. *French*, 91 id. 265.) The compensation of patrolmen is covered by the word " allowance," used in the Constitution. (Laws of 1873, chap. 863, tit. 11, § 9.) The framers of the Constitution had in contemplation a fixed allowance; something that the law gave as a matter of right; something a public officer could demand during his term. (Const., art. 3, § 24; Wharton's Law Dict., " Salary ;" *Rowland* v. *Mayor*, etc., 83 N. Y. 375; *People* v. *Supervisors of Chautauqua*, 43 id. 14.) Patrolmen are appointed for a term within the meaning of the Constitution. (Laws of 1873, chap. 863, tit. 11, § 12; *People* v. *Greene*, 2 Wend. 274; *People* v. *Brundage*, 78 N. Y. 407; *People, ex rel. Ryan*, v. *French*, 91 id. 279.) The Constitution, by inhibiting the passage of local bills affecting the compensation of public officers during their present term of office, did not design that the power to pass such bills should be transferred to any local legislature. (71 N. Y. 28, 327, 349; 69 id. 495, 502.) The provision of the act of 1877, authorizing the common council to fix and regulate the salaries " of various officers, clerks and subordinates of the city of Brooklyn," does not apply to policemen. (*Fellows* v. *Mayor*, etc., 8 Hun, 484; *Landon* v. *Mayor*, etc.,

7 J. & S. 467; *Quinn* v. *Mayor, etc.*, 44 How. Pr. 266; *People, ex rel. Gilchrist,* v. *Murray,* 73 N. Y. 542; *Whitmore* v. *Mayor, etc.*, 67 N. Y. 21; Dill. on Mun. Corp. [3d ed.], §§ 210, 975.) The subject of the acts of 1877 and 1879, so far as they related to policemen, is not expressed in the titles as required by article 3, section 16 of the Constitution. (*Fellows* v. *Mayor, etc.*, 8 Hun, 488; *Huber* v. *People,* 49 N. Y. 132; *Gaskin* v. *Meek,* 42 id. 186; *People* v. *Supervisors of Chautauqua,* 43 id. 10.)

*John A. Taylor* for respondent. The act of 1877 is not a local one within the meaning of the Constitution. (Jour. of Const. Con. 1872–3, p. 305; *Matter of Lexington Ave.,* 29 Hun, 303, affirmed 92 N. Y. 629; *People* v. *Banks,* 67 N. Y. 568; *Shanley* v. *City of Brooklyn,* 30 Hun, 396.) The act in question, although not in the terms of its title expressly amendatory of the charter, is so far *in pari materia* as to be properly considered a charter amendment. (*McCarty* v. *Orphans' Society,* 9 Cow. 437; *People* v. *Achison,* 7 How. 241; *Turnpike Co.* v. *People,* 9 Barb. 161; 1 Kent's Com. 463–4; Potter's Dwar. on Stat. 189; *People* v. *Petrea,* 92 N. Y. 141.) A practical construction of a statute by officers charged with action under it, ratified by the acquiescence of parties interested, is often of controlling weight in determining its true scope. (Cooley on Const. Lim. [5th ed.] 81.) The terms of the constitutional amendment are not sufficiently explicit to include salaries of public officers. (*Moultree* v. *Hunt,* 23 N. Y. 419; Potter's Dwar. on Stat. 145; *Matter of Woolsey,* 95 N. Y. 146; Opinions of Attorneys-General, State of New York, 250; 15 Barb. 529.) While it is true that policemen have been held by the courts to be for some purposes public officers, they were not the public officers contemplated by this amendment. (*Shanley* v. *City of Brooklyn,* 30 Hun, 396.) The language " the term for which said officers are elected or appointed," contemplated only such " terms " of officers as were for a determinate period. (*Speed* v. *Crawford,* 3 Metc. [Ky.] 207; 2 Abbott's Law Dict. 532.)

RUGER, Ch. J.   The plaintiff brought this action to recover the sum of $100, for each of the years 1879, 1880, 1881 and 1882, as the balance of her intestate's salary as policeman in the city of Brooklyn, alleged to be remaining unpaid by the defendant. Said intestate was appointed policeman prior to 1877.   The claim is made by virtue of the charter of that city, appearing in chapter 863, Laws of 1873, which fixed the compensation of patrolman at the sum of $1,100 per annum.   It is answered to this claim that the common council of Brooklyn, by virtue of authority conferred upon them in chapter 459, Laws of 1877, have reduced the annual compensation payable to patrolmen in that city, from $1,100 to $1,000.   It is also claimed that the same reduction was effected by chapter 467 of the Laws of 1879.   If the validity of the reduction made under either authority is established, it constitutes a defense to the plaintiff's cause of action.   The appellant asserts, however, that these acts do not affect the questions in dispute, for the reasons :

*First.* That both of them were, by their terms, restricted to officers to be thereafter elected or appointed ; and

*Second.* In case the first proposition fails, that such acts are obnoxious to the provisions of section 18, article 3 of the Constitution, as being local bills, and " creating, increasing or decreasing fees, percentage or allowances of public officers during the term for which said officers are elected or appointed."

The first proposition depends upon the meaning and effect to be ascribed to the following sections of the acts in question : Section 6 of chapter 459, Laws of 1877, and section 7 of chapter 467 of the Laws of 1879, is similar, reads as follows : " The provisions of this act shall not apply to any officers, who, under the provisions of the Constitution, cannot have their fees, percentages or allowances increased or diminished during their present terms of offices ; but said provisions shall apply to all of those hereafter elected or appointed to perform any service within the city of Brooklyn."   The language of this section is upon its face ambiguous and equivocal, and requires an inquiry into its meaning before the provisions of the act can be understandingly enforced.

In a proper sense there are no public officers in the State, whose compensation may not be increased or diminished by the legislature during their terms of office, except those of governor, lieutenant-governor and other State officers named in the Constitution, judges of the Court of Appeals and justices of the Supreme Court, county judges and surrogates. These are, by the terms of the Constitution, expressly exempted from the power of the legislature to diminish, and in some cases to increase, during their existing terms. None of these persons, however, are officers of the city of Brooklyn or paid from its treasury, and they are not, therefore, the officers referred to by the acts in question. All other public officers are subject to the power of the legislature to increase or diminish their compensation at any time, provided it be done by general law. In a strict sense, therefore, the language of this exception does not apply to the officers in question, for the inhibition is against such legislation by local or private bills only, and not to enactments accomplishing these objects by general law.

In accordance with settled canons for the construction of statutes, however, some effect must be given to all of the language employed in framing them, provided the intent of the legislature is discoverable from the words employed, or other sources of information open to the consideration of the court, and such construction is reasonable and does not lead to absurd or unjust results.

It is quite obvious, from the language of the act, that the legislature had in mind section 18 of article 3 of the Constitution in framing it, because they use the precise language employed in that section in describing the class of officers who are not to be affected by its provisions. Thus, they say it is those officers "who, under the provisions of the Constitution, cannot have their fees, percentage or allowances increased or diminished during their present terms in office." This language is used in section 18, article 3, and in no other place in the Constitution, and unless held to apply to that section, it must be denied any application whatever. It does not follow,

from this circumstance, however, that we must give it the
effect claimed for it by the appellant. It is quite clear, if the
legislature intended the provisions of the act to apply only to
future elected officers, that any reference to the constitutional
provision was utterly unnecessary, as their power of legisla-
tion over that subject was undeniable. It is also quite ob-
vious, from the inclusion of the official names of the officers
in question in the provisions of the act, and the clauses
specially providing that the amount of their compensation
should be left to the power of the common council to regulate,
that the legislature did not suppose they were transcending
their constitutional power in legislating as they did. If the
legislature had intended that the act should affect subsequently-
elected or appointed officers only, they would have said so
directly, and omitted all reference to the constitutional pro-
visions.

It would seem, therefore, that the first clause of section 6
was inserted merely as a tentative provision to save the act
from possible condemnation as being in conflict with the Con-
stitution.

It is evident, from the consideration suggested, that no con-
clusive inference can be drawn from the insertion of the
clause in question, that the legislature intended thereby to ex-
empt officers from the operations of the act who would other-
wise be included in its provisions, but it would seem that they
intended to leave the act open in that respect, to be deter-
mined by the solution of the question as to their constitutional
power to pass it. The act is clearly hypothetical, and its true
reading, if paraphrased according to its apparent object and
meaning, would be as follows: This act shall not affect any
officers named therein whose compensation cannot constitu-
tionally be increased or diminished during their existing terms;
and if so read, there is afforded no room for the contention
that the legislature intended thereby to exempt the existing
police force from its operation.

We thus arrive at the question whether the statutes referred
to violate section 18 of article 3 of the Constitution.

It is quite certain that the act of 1877 does not infringe upon its letter, and it is only by a resort to principles of construction that the appellant can hope to nullify its provisions.

The Constitution prohibits the legislature, by local or private bills, from increasing or diminishing the "fees, percentage or allowances" of certain officers during existing terms of office. The act of 1877 refers only to salaries, and does not purport, in itself, either to increase or diminish those, but attempts only to confer power upon the common council to fix and regulate such salaries as are payable from the municipal treasury.

The appellant claims, however, that the act is within the spirit and meaning of the constitutional provisions, and that, therefore, the attempt, by the common council, to reduce the patrolmen's salaries was ineffectual. The rules applicable to the construction of constitutional provisions are the same generally as those applying to statutes, and the object in both cases is to arrive at the intention of the law makers.

If the meaning of a given provision be clear and unambiguous, and leads to no absurd or unjust result, it leaves no room for the application of rules of interpretation, and must, therefore, be enforced according to its letter and spirit. (Potter's Dwarris on Stat. and Const. 9 ; *Jackson* v. *Lewis*, 17 Johns. 475.) It was said in *Newell* v. *People* (3 Seld. 97), " whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing we are to seek is the thought which it expresses. To ascertain this the first resort in all cases is to the natural signification of the words employed in the order and grammatical arrangement in which the framers of the instrument have placed them. If thus regarded, the words embody a definite meaning which involves no absurdity and no contradiction between different parts of the same writing, then that meaning upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed." (See, also, *McCluskey* v. *Cromwell*, 11 N. Y. 602 ; *Johnson* v. *H. R. R. R. Co.*, 49 id. 455.) If the words used in a statute are susceptible of different

meanings, that one must be ascribed to them which accords with the natural and obvious signification and import of the language used. For the purpose of arriving at an understanding of its signification, it is the duty of the courts to examine the whole act, and by a comparison of, and a consideration of its various clauses and provisions, determine the meaning of any doubtful or ambiguous phraseology used therein. (*Beebee v. Griffing*, 14 N. Y. 244.) But where the same words are used in different parts of the same act, in connection with the same subject-matter, it is contrary to settled rules of construction to give them different meaning, in the several places where they occur. It was said by Lord DENMAN in *Reg.* v. *The Com. of the Poor Laws* (cited in Potter's Dwarris, 195): "We disclaim altogether the assumption of any right to assign different meanings to the same words in an act of Parliament on the ground of a supposed general intention in the act, we think it necessary to give a fair and reasonable construction to the language used by the legislature; but we are not to assume the unwarrantable liberty of varying that construction for the purpose of making the act consistent with any views of our own." Following the rule referred to in examining the question presented for our consideration, we can see no reasonable ground for holding that salaries of public officers are included in the provision in question.

The omission of the word "salaries," and the use of the rather uncommon word "allowances" in section 18, considered by itself, would be quite significant, and suggestive of great doubt as to the real signification of the provision; but when considered in connection with other occasions where the framers of the Constitution and the law-makers have been called upon to express themselves on the subject of payments to public servants, we shall find a uniform and invariable use of language, showing that the respective phrases of "compensation," "salary," and "allowances" have been used discriminatingly by them, and with a perfect understanding of their true meaning. Thus we find that the Constitution provides that "each member of the legislature shall receive for his services an

annual salary of $1,500 ; " but senators, when serving as members of the court for the trial of impeachments, and such members of the assembly as shall be appointed managers of an impeachment, " shall receive an additional allowance of $10 a day." (§ 6, art. 3.) The governor " shall receive for his services an annual salary." (§ 4, art. 4.) The lieutenant-governor shall receive for his services an annual salary, " and shall not receive or be entitled to any other compensation, fee, or perquisite for any duty or service he may be required to perform by the Constitution or the law." (§ 8, art. 4.) The secretary of State, comptroller, treasurer and attorney-general shall each " receive for his services a compensation which shall not be increased or diminished during the term for which he shall have been elected." (§ 1, art. 5.) A superintendent of public works " shall receive a compensation to be fixed by law." (§ 3, art. 5.) Three deputy superintendents " shall receive for their services a compensation to be fixed by law. (Id.) Judges of the Court of Appeals, and justices of the Supreme Court " shall receive for their services a compensation to be established by law, which shall not be diminished during their official terms." (§ 14, art. 6.) It is provided for the county judge that " his salary, and the salary of the surrogate, when elected as a separate officer, shall be established by law," and " shall not be diminished during his term of office." (§ 15, art. 6.) The compensation of the clerk of the Court of Appeals "shall be fixed by law." (§ 20, art. 6.)

" No officer whose salary is fixed by the Constitution shall receive any additional compensation. Each of the other State officers named in the Constitution shall, during his continuance in office, receive a compensation to be fixed by law, which shall not be increased or diminished during the term for which he shall have been elected or appointed, nor shall he receive to his use any fees or perquisites of office, or other compensation." (§ 9, art. 10.)

" Judicial officers in office when this Constitution shall take effect may continue to receive such fees and perquisites of office as are now authorized by law, until the first day of July, 1847."

(§ 11, art. 14.) " Any person holding office under the laws of this State, who, except in payment of his legal salary, fees or perquisites," shall receive, or consent to receive," directly or indirectly, any thing of value," etc., shall be deemed guilty of a felony. (§ 1, art. 15.)

It is seen by this review that the word " allowance " is used in the Constitution in a sense entirely different and distinct from that of salary. The only instance in which it is employed, aside from the section in question, being to denote something to be given or yielded by the State in addition to a stated compensation, termed a salary. The generic term used by them to cover all forms of payments made to public officers for services is invariably that of compensation, and the specific term used to denote payments to officers having a fixed, definite and stated compensation, is that of salary.

A brief reference to the action of the several conventions which preceded the adoption of the present Constitution will show that the words of the existing section were deliberately selected after the rejection, by the people, of a provision couched in more comprehensive language. Among the sections submitted to the people by the constitutional convention of 1867, was the following : § 17. " The Legislature shall not grant any extra *compensation* to any public officer, servant or contractor, nor increase or diminish any *compensation*, except that of judicial officers, during their term of office." (Proceedings and Debates, p. 3961, Atlas Ed.) This provision, together with the Constitution, of which it was a part, was rejected by the people. Subsequent to this rejection, a convention assembled under the authority of chapter 884, Laws of 1872, and framed provisions, which, after being revised by the action of the subsequent legislature, resulted in the submission to the people of the Constitution as it now stands, and as thus submitted it was approved and adopted by them.

It will thus be seen that the framers of the Constitution, when they attempted to draw provisions specifically limiting the power of the legislature over the compensation of public officers, used the most appropriate, natural and comprehensive

language adaptable to the purpose which they had in view, and with a discriminating sense of the meaning of the words used by them. It is impossible to resist the conviction that by the use of the words "salary" and "compensation" in all of the provisions attempting the inhibition of the legislature from interfering therewith, and their exclusion from the clause in question, that they intended to exempt persons, whose services were payable by a fixed and stated compensation, from the operation of the section. It will also be observed that in the structure of the clause referred to, the words first used, and presumably those to which the most importance was attached, are those of "fees and percentages," and then follows the word "allowances," which seems to have been employed by way of repetition, and as a possible cover for some form of compensation of a similar character not included in its previous language. The rule embraced in the maxim of *noscitur a sociis* seems to be peculiarly applicable to the question presented, and requires a definition of the word "allowance" similar to that of the language to which it is so closely allied.

The natural interpretation of these provisions is that they were intended to include only those irregular, indefinite and uncertain modes of compensating public servants which were indicated by words of like character and meaning, as those of "fees," "percentages," etc. The case of *McGaffin* v. *City of Cohoes* (74 N. Y. 389) is illustrative of the rule referred to. There the words "contract, obligation or liability" were held, by force of the maxim in question, to exclude liability for torts; the late Chief Judge Church saying, that "words are often used redundantly or repetitiously, without strict regard to the meaning of each, but for greater caution to express the full meaning of the principal subject. In such cases, the maxim *noscitur a sociis* is applied." In the case of *Corning* v. *McCullough* (1 N. Y. 47), it was held that a clause in a statute prescribing three years limitation "for any forfeiture or cause, the benefit and suit whereof is limited to the party aggrieved," should be construed as meaning actions for a forfeiture, or cause of action of like nature only, and not to apply to

cases of contract liability.  (See, also, *Aikin* v. *Wasson*, 24 N.
Y. 484; *Coffin* v. *Reynolds*, 37 id. 644.)

It seems to us that we cannot, without doing violence to the
meaning and intent of the authors of the Constitution, ascribe
to them, by the use of such a word, in such a relation, an inten-
tion to reach and affect so important a subject as that embraced
in regulating the compensation of those numerous public ser-
vants whose services are compensated by fixed salaries.  Whether
we consider the ordinary and popular signification of the word,
òr the more accurate and technical meaning attached to it by
lexicographers, it is entirely inappropriate to express the idea of
a fixed compensation adopted for the payment of services ren-
dered by one person to another.  The word "allowance" imports
the voluntary act of one party in doing something which is in
his discretion to perform or withhold at pleasure.  To allow im-
plies the right, to determine, and is the act of a superior toward
a dependent granting a privilege which he has authority to
confer or deny.  It does not express the relations existing be-
tween co-contractors, vendor and vendee, or employer and
employe where there is a right secured by contract on one
side, and no power of voluntary action on the other.

Allowances are made by husband to wife, parents to chil-
dren, the head of a family to its members, superannuated depend-
ents and servants, from the benevolent to the poor, and in
cases where the act is discretionary with the donor, as a reward
for benefits conferred, or services voluntarily rendered by one
to another.

Referring to some of the uses of the words in question
adopted by the legislature in statutes we find by section
3, chapter 521, Laws of 1880: "No officer or person who
is paid a salary from the city treasury shall receive to or
for his own use any fees, costs, allowances, perquisites of
office, commissions," etc., and the comptroller is empowered
to examine any such officer under oath touching "the
amount of any fees, costs, allowances, perquisites, etc."
Allowances have been authorized to be made by the court to
parties in actions in certain cases, and extra allowances in actions

to foreclose mortgages, for partition of real property, and to obtain construction of wills, etc. (Code of Pro., §§ 303–309; and Code of Civ. Pro., §§ 3252, 3253); also for expenses of poor witnesses (§ 1, chap. 155, Laws of 1869), and so, too, in cases of divorce, infancy, lunacy and wards of court, salvage, and all discretionary awards. They are also made to sheriffs on attachment proceedings when no fixed charges are provided. (Code of Civ. Pro., § 656.) They were formerly authorized in some special cases to be made to canal contractors for work and labor (§ 2, chap. 273, Laws of 1841; 1 R. S., 632, § 37; 653 §§ 76, 77; 655, § 2), and to compensate appraisers appointed by loan commissioners. (3 Stat. at Large, 87, § 35.) *Per diem* allowances were made to the justices of the Supreme Court in addition to their salaries, and it was provided that the compensation of those residing in New York city should not thereby be deemed to be reduced. (Chap. 308, § 9, Laws of 1870.) The health officer receives an allowance by way of commission on collections from coasters. (Chap. 302, Laws of 1829.) The clerks of the senate and assembly received an allowance for stationery (§ 1, chap. 1, Laws of 1859), but were to receive a salary and no extra allowance by section 3, chapter 379, Laws of 1879. Commissioner of public accounts receives a *per diem* compensation and additional allowance for mileage. (Chap. 223, Laws of 1862.) Pilots have an allowance for extra service (§ 8, chap. 69, Laws of 1847), as do also receivers of insolvent financial and life insurance companies. (§ 1, chap. 141, Laws of 1821; § 2, chap. 3, Laws of 1841; chap. 442, Laws of 1871; chap. 902, Laws of 1869.)

To the uses of the words shown by these citations, others of the same character could be made indefinitely, and we have yet to discover any employment of the word " allowance " by law-makers or others which is the exact equivalent of either of the words " salary " or " compensation." Reference to the works of the lexicographers shows Webster's definition to be, " The act of allowing, granting or admitting." " Permission or license." " That which is allowed; a portion appointed; a limited quantity of meat and drink when provisions fall short." " A cus-

tomary deduction from the gross weight of goods." The substance of the definitions in Crabbe's English Synonyms, is that an allowance is gratuitous; it ceases at the pleasure of the donor. Stipends and salaries are the requital of some supposed service, and are paid yearly or at even portions of a year, and are the subject of contract between the parties.

Worcester gives a definition similar to that of Crabbe, but refers to the word "salary" as one of the synonyms of "allowance," distinguishing them, however, by stating that the latter is gratuitous and the former a stated compensation, payable under a contract. Richardson's English Dictionary gives, "to permit, to concede, to suffer, to assent, to yield." Other lexicographers give definitions similar to those of Worcester and Crabbe, and seem to exclude the idea that the terms are analogous, except, perhaps, in a very loose and imperfect sense.

It would seem from the foregoing illustrations that the word "allowance" has a plain, definite and precise meaning attached to it by authors and law-makers, and the duty of the court to enforce it as it reads, is clear and unmistakable. We have no power, and it is not our office to stretch the meaning of words used, for the purpose of covering an object which we have no other means of determining to have been within the contemplation of the authors of the Constitution, than that of the language employed by them. It, therefore, seems to us, not only a reasonable, but a necessary inference from the invariable use by the authors of the Constitution of the words "salary" and "compensation" when referring to that kind of payment made to public officers by way of salary, and their deliberate exclusion from the clause in question, that they did not intend to include salaried officers within its meaning.

This view is greatly strengthened by the express provisions made in that instrument with reference to the immutability of the compensation of a large number of such officers, and the inference which may be drawn therefrom that they did not intend to enact general provisions to accomplish similar objects.

In opposition to our views it is urged that such a construction would leave no subject of importance for the provisions in

question to operate upon; but we do not think this is so. While it is obvious that it does, to a certain extent, narrow its application, yet a large body of public officers, whose compensation consists solely of fees, percentages and allowances, such as sheriffs, county clerks, registers of deeds, coroners, port wardens, harbor-masters, pilots, commissioners, health office, justices, constables and others who might be named, are still left to be affected by these provisions of the Constitution.

We are quite aware of the great importance of the question presented, and of the divers views existing with reference to it among judges and members of the legal profession; but no sufficient reason has been suggested, as we think, which authorizes the importation into the Constitution of a meaning which does not flow naturally and obviously from the language employed in it.

Other minor questions raised by the learned counsel for the appellant have been examined by us, but we find none of sufficient plausibility to raise serious doubt as to the correctness of the judgment appealed from.

The judgment should, therefore, be affirmed.

All concur.

Judgment affirmed.