OPINION OF THE COURT
Jack M. Battaglia, J.
For its complaint against Willie Rosenfeld, Fallsview Glatt Kosher Caterers, Inc. alleges that it “operates a catering business . . . and specializes in organizing and operating programs at select hotels whereby [its] customers are provided with Glatt Kosher food service during Jewish holiday seasons”; that during the 2004 Passover holiday, it “operated a program whereby [it] provided accommodations, food and entertainment for its customers at Kutcher’s Country Club”; that Mr. Rosenfeld “requested accommodations for 15 members of his family . . . and full participation in the Program”; and that he agreed to pay Fallsview $24,050 “for the Program”; that Fallsview “made the necessary arrangements,” but Mr. Rosenfeld and his family “failed to appear at the hotel without notification” to Fallsview; and that Mr. Rosenfeld “breached the agreement by failing to remit . . . payment in the amount of $24,050.00.” (See complaint 1Í1Í1-7.)
In lieu of an answer, Mr. Rosenfeld has moved for dismissal of the complaint pursuant to CPLR 3211 (a) (5), contending that the action is barred by section 2-201 of the Uniform Commercial Code. The motion is supported by the affidavit of Stuart A. Blander, Esq., who, in addition to serving as counsel to Mr. Rosenfeld, appears to have a direct connection to the alleged transaction that is the subject of the suit. In opposition, Falls-view relies on the affidavit of Mark Weiss, one of its officers, and on documents attached to the affidavit. The affidavits are appropriately considered on the motion (see CPLR 3211 [c]); as for the documents, Mr. Rosenfeld does not question their admissibility, although he does dispute the significance of some of them.
Section 2-201 provides that, subject to stated exceptions, “a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the par *559 ties and. signed by the party against whom enforcement is sought.” (UCC 2-201 [1].) Although Mr. Blander’s affidavit states that Mr. Rosenfeld “vigorously denies the existence of any agreement — oral or written” (see affidavit in support of motion to dismiss complaint 1Í 3), there is no affidavit from Mr. Rosenfeld to that effect or denying that there is “some writing sufficient to indicate that a contract for sale has been made” that was signed by or for him (see UCC 2-201 [1]).
Addressing General Obligations Law § 5-703, the First Department has held:
“The Statute of Frauds being an affirmative defense, it was incumbent on the movant to show that there was in fact no written contract or ‘note or memorandum thereof . . . This fact should have been shown by affidavits from persons having knowledge of the facts. The only supporting affidavits are those from [movant’s] attorneys. We have frequently said that affidavits from attorneys without knowledge of the facts are without probative value ...” (Subgar Realty Corp. v Gothic Lbr. & Millwork, 80 AD2d 774, 774 [1st Dept 1981]; see also Scarvalone v Kowalewicz, 26 AD2d 885, 886 [3d Dept 1966]).
Moreover, because Willie Rosenfeld has not submitted his sworn denial of the agreement sued upon, the court would be inclined to hold the motion “in abeyance until the plaintiff has had an opportunity to depose the defendant.” (See Boylan v Morrow Co., 63 NY2d 616, 619 [1984]; see also CPLR 3211 [d]; UCC 2-201 [3] [b]; DF Activities Corp. v Brown, 851 F2d 920, 922 [7th Cir 1988].)
Fallsview, however, does not raise these points, nor does it contend that factual issues preclude a determination as to the enforceability of the alleged agreement in light of section 2-201 (1) of the Uniform Commercial Code. (See Levin v Hoffman Fuel Co., 94 AD2d 640, 641 [1st Dept 1983], affd 60 NY2d 665 [1983]; Morton Bldgs. v Edson, 250 AD2d 657, 657-658 [2d Dept 1998]; Marbelite Co., Inc. v National Sign & Signal Co., Inc., 2 Fed Appx 118, 120 [2d Cir 2001].) Fallsview does not contend that any of the statutory exceptions apply, or that there is any other basis to enforce the agreement if section 2-201 (1) applies. (See Country-Wide Leasing Corp. v Subaru of Am., 133 AD2d 735, 736 [2d Dept 1987].)
Although Fallsview has not explicitly conceded that no qualifying writing exists, both parties have focused their legal and *560 factual arguments on a single question — that is, whether the alleged agreement that is the basis for Fallsview’s action is a “contract for the sale of goods for the price of $500 or more” within the meaning of section 2-201 (1). The parties having charted that course (see Vasinkevich v Elm Drugs, 208 AD2d 522, 523 [2d Dept 1994]), supported by considerations of judicial economy, the court sees no compelling reason not to address the question.
Although the question to be addressed proceeds from the statutory language, “contract for the sale of goods” (see UCC 2-201 [1]), “[t]he sales-services dichotomy has been recognized and developed from the days of the law merchant.” (See Milau Assoc. v North Ave. Dev. Corp., 42 NY2d 482, 485 [1977].) Presented with a “hybrid sales-services contract” (see id.), that is, a contract that calls for the furnishing of both goods and services, the court must decide whether to apply the law applicable to a sale of goods, currently article 2 of the Uniform Commercial Code as adopted in this state, or to apply the law applicable to service contracts, the general law of contracts or some specialized portion thereof. The agreement alleged in the complaint (and limiting attention for the moment to the complaint alone) calls for the furnishing of “accommodations, food and entertainment” (complaint 1i 1) with “food” qualifying as “goods” (see UCC 2-105 [1]).
In Perlmutter v Beth David Hosp. (308 NY 100 [1954]), a case decided under the pre-Code Sales Act, the Court of Appeals held that “when service predominates, and transfer of personal property is but an incidental feature of the transaction, the transaction is not deemed a sale within the Sales Act” (id. at 104). “[I]t is the transaction, regarded in its entirety, which must determine its nature and character” (id. at 106). The Court “look[s] at the transaction for what it actually is” (id. at 107), seeking the “essence of [the] particular contract” (id. at 106), “the main object sought to be accomplished” (id.).
In Perlmutter, the Court ruled that the “transfusing of ‘bad’ blood, supplied by [a] hospital for a price as part of the customary services rendered by the hospital to its patients” (id. at 103) was not a “sale” of the blood for purposes of the Sales Act’s implied warranties of fitness. In so doing, the Court distinguished its prior decision in Temple v Keeler (238 NY 344 [1924]), relied upon by the plaintiff in the case before it, and relied upon by Mr. Rosenfeld here:
“Not at all analogous to the case before us is our *561 decision . . . holding that, ‘where a customer enters a restaurant, receives, eats and pays for food, delivered to him on his order, the transaction is a purchase of goods.’ . . . While it has been said that a restaurant owner does not sell food, but rather renders a service, the fact is that there is ‘a sale of what is actually used’ . . . [T]here can be no doubt that, when one goes into a restaurant, he does so in order to buy what the restaurant in truth has to sell, namely, food.” (Perlmutter v Beth David Hosp., 308 NY at 107, quoting Temple v Keeler, 238 NY at 346, 347.)
The issue in Temple v Keeler was also the applicability of an implied warranty of fitness. In reaching the conclusion that there was “a sale of what [was] actually used” (id. at 347), the Court noted a prior “authoritative decision,” construing a criminal statute, which “held that a hotel keeper who places before his guests at dinner, partridges, sells the birds, although the guests paid a total sum for [food] and lodging.” (Id.)
In reaching the result it did in Perlmutter, the Court was influenced by the consequence that “if the transaction [was] deemed a sale, liability would attach irrespective of negligence or other fault.” (See Perlmutter v Beth David Hosp., 308 NY at 107.) In a subsequent decision, the Court of Appeals noted that its analysis in Perlmutter was “supported by policy considerations peculiar to the impure blood cases,” and stated that “the court’s sensitivity to . . . policy considerations . . . should suggest the need to assess all hybrid transactions along the sales-services continuum both legally and pragmatically.” (Milau Assoc. v North Ave. Dev. Corp., 42 NY2d at 486.)
The holding in Temple v Keeler that the furnishing of food in a restaurant or hotel is accompanied by an implied warranty of fitness is now part of the Uniform Commercial Code. Section 2-314 (1) states that “a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind,” unless the warranty is excluded or modified as permitted in a separate provision, and that “\u\nder this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.” (UCC 2-314 [1] [emphasis added].) Thus the Uniform Commercial Code resolved the conflict among the states on the question addressed by Temple v Keeler, adopting the answer given by our Court of Appeals. (See Sofman v Denham Food Serv., Inc., 37 NJ 304, 309-312, 181 A2d 168, 171-173 [1962] [Schettino, J., concurring].)
*562 The question becomes then whether the holding in Temple v Keeler necessarily constitutes a determination that every agreement that includes the furnishing of food is a “contract for the sale of goods” as that term is used in article 2’s statute of frauds, section 2-201. Decisions subsequent to Temple v Keeler that apply its holding do not answer the question, since they, too, involve the issue of warranty. (See Frier v Laube’s Old Spain, 265 App Div 402 [4th Dept 1943]; Conklin v Hotel Waldorf Astoria Corp., 5 Misc 2d 496 [NY City Ct, NY County 1957]; Grossman v Hotel Astor, 166 Misc 80 [Manhattan Mun Ct 1937].)
In the most recent of these decisions, England v Sanford (167 AD2d 147 [1st Dept 1990], affd 78 NY2d 928 [1991]), the First Department held that a plaintiff who sustained personal injuries as a result of eating unwholesome food at a party catered by the defendant could amend her complaint to allege breach of warranty. The defendant caterer argued that the “theory was [not] viable since the service aspects of defendant’s contract with the host of the party predominated over its sales aspect, i.e., that defendant was engaged mainly to organize a party and that his provision of food was merely incidental to this main purpose.” (Id. at 148.) Taking a “pragmatic point of view,” the Court rejected the argument, concluding that “[i]f policy considerations dictate that a restaurant owner should be liable without fault for serving unwholesome food ... so too should a caterer.” (Id.) The Court cited section 2-314 (1), but did not explain why the issue was not resolved by that provision’s explicit language. It may be that the party was catered at the home of the host or some location not maintained by the caterer, so that the statutory language (“consumed either on the premises or elsewhere”) was considered not strictly applicable.
A too simple answer to our question is that the statute itself explicitly limits the stated rule about serving food to “this section” (see UCC 2-314 [1]), and the rule, therefore, does not apply to any other section, such as the statute of frauds. Despite the limitation, sections 2-314 and 2-201 explicitly apply to “contracts for the sale of goods,” and usually statutory language is given the same meaning throughout. (See Riley v County of Broome, 95 NY2d 455, 466 [2000]; Mangam v City of Brooklyn, 98 NY 585, 591-592 [1885].) Moreover, “the predominant purpose test. . . presupposes that if Article 2 is to apply or not to apply, it should apply (or not apply) to the whole transaction.” (1 White and Summers, Uniform Commercial Code § 1-1, *563 at 4-5 [Practitioner’s 4th ed 1995]; see also Perlmutter v Beth David Hosp., 308 NY at 104.)
New York courts, nonetheless, have seemed willing to focus on the nature of the dispute between the parties, and to distinguish prior authority, when the issue is not the existence of an implied warranty, which implicates fundamental standards of liability, but more collateral matters, such as the statute of limitations (see Perlmutter v Don’s Ford, 96 Misc 2d 719, 721 [Utica City Ct 1978]) or the statute of frauds (see Pecker Iron Works v Sturdy Concrete Co., 96 Misc 2d 998, 1000-1001 [Civ Ct, Queens County 1978]; see also Sands v Feldman, 243 AD2d 294 [1st Dept 1997]).
Moreover, “[t]he rules of construction of statutes are never absolute and must always be considered in the light of the surrounding circumstances; the same word may be used in varying senses depending on the intent of the Legislature.” (Colon v Aetna Cas. & Sur. Co., 64 AD2d 498, 503 [2d Dept 1978], affd 48 NY2d 570 [1980]; see also Becker v McCrea, 119 App Div 56, 58 [2d Dept 1907], revd on other grounds 193 NY 423 [1908].) A statutory warranty is a different thing than a statute of frauds— the one establishes a standard of liability against which contractual performance is to be assessed, the other determines whether the contract is provable. Each is affected by a different purpose, and operates guided by different policies. Indeed, not all statutes of frauds are alike. “New York has enacted several . . . each with its own particular language and requirements,” and they “may require more or less particularity in the writings depending upon the Legislature’s perception regarding the risks of false claims inherent in the contractual setting.” (Fox Co. v Kaufman Org., 74 NY2d 136, 140-141 [1989].)
“Predominant purpose” analysis may, and does, appropriately reflect the kinds of rules to be applied as its result and attendant policy considerations. This is not to say that the contract is “divisible” (see Perlmutter v Beth David Hosp., 308 NY at 104), but that the Uniform Commercial Code may be. For present purposes, this means that the existence — or not — of an implied warranty accompanying the food served at Kutcher’s Country Club during Fallsview’s Passover “program” will not determine whether a contract for participation in the “program” is provable.
Mr. Rosenfeld contends that the “predominant purpose” and “main objective” of the agreement alleged by Fallsview was the “service of Kosher food,” while the hotel accommodations and *564 entertainment were merely “incidental or collateral” services. (See affidavit in support of motion to dismiss complaint 1i 6.) Mr. Rosenfeld points to the apparent nature of Fallsview’s primary business, catering, as revealed by its corporate name “Fallsview Glatt Kosher Caterers, Inc.,” and the business name “The Glatt Boys.” (Id.) The programs organized and operated by Fallsview are described by reference to “Glatt Kosher food service.” (Id.) These things are found on the face of Fallsview’s complaint. (See complaint 111.)
Defendant’s contention that the “predominant purpose” of the alleged agreement is the sale of food is said to be “compelled by the very nature of the Passover holiday” (see affidavit in support of motion to dismiss 1Í 7).
“The essential religious obligation during this eight day period — and the principal reason why people attend events similar to the Program sponsored by plaintiff — is in order to facilitate their fulfillment of the requirement to eat only food which is prepared in strict accordance with the mandate of Jewish law for Passover, i.e., food which is ‘Kosher for Passover’. It is the desire to obtain these ‘goods’ — and not the urge for ‘entertainment’ or ‘accommodations’ — that motivates customers to subscribe to such ‘Programs.’ ” (Id.)
According to Mr. Rosenfeld — or rather Mr. Blander, his attorney — the “very essence of the ‘experience’ is the presentation and enjoyment of abundant, frequent and high quality Kosher for Passover cuisine to the guests.” (Reply affidavit in further support of motion to dismiss complaint If 8.) Although, generally, an attorney’s sworn or affirmed statement as to the facts is “without evidentiary value” because the attorney has no personal knowledge of them (see Zuckerman v City of New York, 49 NY2d 557, 563 [1980]), Mr. Blander appears to be in a position to speak to the matters alleged in his affidavit. The affidavit of Mark Weiss, Fallsview’s officer, is accompanied by “confirmation” documents, two of which purport to confirm reservations of “Stu, Blander” and “Adam, Eitan, Akiva Blander.” (See affidavit of Mark Weiss in opposition to defendant’s motion to dismiss, exhibit B.)
Mr. Weiss does not, in any event, dispute Mr. Blunder’s assertions concerning the “motivation” of defendant and his guests. Much of what Mr. Blander says is reflected in statutory provisions dealing with the representation of food and other articles *565 as “Kosher” (see Agriculture and. Markets Law § 201-a et seq.; General Business Law § 349-a), and would be matters of rather common knowledge, in Brooklyn at least.
Mr. Weiss’s affidavit is also accompanied by 10 sheets, designated “Kutcher’s Country Club Daily Activities” for Sunday, April 4, through Tuesday, April 13, 2004. The activities possible include tennis, racquetball, swimming, Swedish massage, “make over face lift show,” “trivia time,” aerobics, bingo, ice skating, dancing, “showtime,” “power walk,” arts and crafts, day camp, ping-pong, Yiddish theater, board games, horse racing, horseback riding, wine tasting, and indoor bocci — and that is only through Wednesday. Throughout the period, there are traditional and Orthodox religious services, lectures on religious and other subjects (presumably with a religious or cultural perspective), and a series of activities that are clearly designed to be of interest to families of observant Jews during a highly significant period in their calendar. (See affidavit of Mark Weiss in opposition to defendant’s motion to dismiss, exhibit A.) These activities are provided, together with accommodations and food, for an “all inclusive” price that is apparently determined by the size and location of the room(s) and the numbers and ages of the persons in each party. (See id., exhibit B.)
The court accepts Mr. Blander’s characterization of Falls-view’s Passover program as an “experience,” and has no basis to dispute that, for him, its “very essence” is the “presentation and enjoyment of abundant, frequent and high quality Kosher for Passover cuisine.” But a review of the characteristics of the “program,” which is the subject matter of the alleged agreement, leads the court to conclude that the “essence” of the family and communal “experience” is defined primarily by “services” and not by “goods.”
The consequences of that conclusion, i.e., that the alleged agreement is not subject to the article 2 statute of frauds, is supported by the structure, terms, purpose and context of the statutory provision. As with all statutes of fraud, the purpose of section 2-201 is “to avoid fraud by preventing the enforcement of contracts that were never in fact made.” (Fox Co. v Kaufman Org., 74 NY2d at 140.) Section 2-201’s attempt to serve that purpose was designed in a transactional context permeated with “forms” — quotations, orders, order acknowledgments or confirmations, invoices, bills of lading, and delivery receipts among them. That context is reflected in the statute’s “merchant’s exception” (see UCC 2-201 [2]), as well *566 as article 2’s parol evidence rule (see UCC 2-202), its provision on firm offers (see UCC 2-205), and, perhaps most significantly, its attempt to address the “battle of the forms” (see UCC 2-207).
The intended scope of section 2-201 is also indicated by its provision that “[a] writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in the writing.” (See UCC 2-201 [1].) The importance of a quantity term is also evident in the “partial performance” exception, which is limited to “goods for which payment has been made and accepted or which have been received and accepted.” (See UCC 2-201 [3] [c].) For the Uniform Commercial Code, quantity is even more important than price. (See UCC 2-305 [1].) A contract of the type involved here would rarely, if ever, specify the “quantity” of the “goods” to be provided. Nor would, for example, a contract for a week’s stay at a weight loss spa, or a zen vegetarian retreat, or a cruise of the islands. Even the most formal of signed contracts would be at risk of unenforceability under section 2-201 for lack of a term specifying the “quantity” of food that would be consumed.
And what of the limitation in section 2-201 to the “sale of goods for the price of $500 or more”? (UCC 2-201 [1].) Does the alleged agreement here specify such a price? In an all-or-nothing, nondivisible regime, such as the “predominant purpose” test suggests, how is the “price” determined? Is it the total contract price, or just the price of the “goods,” and, if the latter, how is an “all inclusive” cost treated? Here, the complaint alleges a total due of $24,050 for 15 persons, and Mr. Weiss provides 10 “confirmation” documents ranging in amounts from $1,750 to $3,750. Are all or any covered, or only some?
Plaintiff argues that “[d]efendant’s proposition that a hotel reservation is a sale of goods would render all reservations made via telephone or the internet unenforceable and would leave hotels in a precarious economic position.” (Affirmation of Sheldon Eisenberger in opposition to defendant’s motion to dismiss the complaint H 10.) That may or may not be true, but the argument does highlight the importance of ensuring that a statute of frauds structured and outfitted by the Legislature for a particular transactional context not be casually applied to a very different commercial segment and model. The structure and *567 terms of section 2-201 tell us that it was not intended to cover the agreement alleged in this complaint.
Defendant’s motion to dismiss is denied.